275-08/GMV/PLS
FREEHILL HOGAN & MAHAR LLP
Attorneys for Plaintiff Mansoura Maritime
80 Pine Street
New York, NY 10005
(212) 425-1900
(212) 425-1901 fax
Gina M. Venezia (GV 1551)
Pamela L. Schultz (PS 8675)



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| MANSOURA MARITIME,<br><br>                Plaintiff<br><br>- against -<br><br>MIDGULF INTERNATIONAL LTD.,<br><br>                Defendant | **08 cv 5050 (RMB)**<br><br>**AMENDED VERIFIED<br>COMPLAINT** |

Plaintiff MANSOURA MARITIME ("MANSOURA") as and for its Amended Verified Complaint against Defendant MIDGULF INTERNATIONAL LTD. ("MIDGULF"), alleges upon information and belief as follows:

1.      This is an admiralty and maritime claim within the meaning of Rule 9(h) of the Federal Rules of Civil Procedure in that it involves a claim for the breach of a maritime contract of charter party. This case also falls under this Court's admiralty and maritime jurisdiction pursuant to 28 U.S.C. §1333, and this Court's federal question jurisdiction pursuant to 28 U.S.C. §1331 in that the action arises under the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards, codified at 9 U.S.C. §201 *et seq.* and/or the Federal Arbitration Act, 9 U.S.C. §1 *et seq.*

2. At all times relevant hereto, Plaintiff MANSOURA was and still is a foreign business entity duly organized and existing under the laws of a foreign country with an address at 80 Broad Street, Valetta, Malta.

3. At all times relevant hereto, and upon information and belief, Defendant MIDGULF was and still is a business entity duly organized and existing under the laws of a foreign country with an address at 120, Gladstones Street, Fouloune House Flat 202, 3032 Limassol, Cypress.

4. On or about 11 January 2008, Plaintiff, as owner of the M/V ANDROMEDA, entered into a maritime contract of charter party with Defendant MIDGULF for the carriage of 8,000 metric tons of crashed sulphur in bulk, 5% more or less in charterers option. A copy of the charter party is attached hereto as **Exhibit A**.

5. The charter party provided that the cargo was to be discharged at 1 or 2 safe berths, always afloat where there is 21 feet of salt water.

6. Pursuant to the charter party, the cargo was loaded and the vessel proceeded to Selaata, Lebanon where MIDGULF nominated Lebanon Chemicals Co. SAL ("Lebanon Chemicals") as the discharge berth.

7. The Lebanon Chemicals berth nominated by MIDGULF was unsafe and as a direct consequence, the vessel was unable to discharge for a period of approximately ten days.

8. The nomination of Lebanon Chemicals as the discharge berth was in violation of the terms of the charter party, which required MIDGULF to nominate and provide a safe berth in accordance with the charter party, and renders MIDGULF liable for detention.[1]

---

[1] "Detention" is a specific maritime term which is intended to apply in a situation where a charterer uses a vessel for a purpose or time frame beyond that contemplated by the charter party.

9. Following the discharge, on February 25, 2008, MANSOURA submitted to MIDGULF the amounts due and outstanding under the charter party as a result of the nomination of an unsafe berth, including detention of $178,299.50.

10. Despite due demand, MIDGULF did not pay the amounts due and outstanding and there remains due and owing to MANSOURA the full amount of $178,299.50.

11. Plaintiff MANSOURA has fulfilled all obligations required of it under the charter party.

12. The charter party provides that it is to be governed by English law and that any disputes between the parties are to be resolved by arbitration in London

13. MANSOURA has commenced and/or shortly will commence arbitration proceedings in London, and MANSOURA specifically reserves its right to arbitrate the substantive matters at issue.

14. This action is brought to obtain jurisdiction over MIDGULF and to obtain security in favor of MANSOURA in respect to its claims against MIDGULF and in aid of London arbitration proceedings.

15. Under English law, including but not limited to Section 63 of the English Arbitration Act of 1996, costs including attorney fees, arbitrators' fees, disbursements and interest are recoverable.

16. This action is further brought to obtain security for any additional sums to cover Plaintiff's costs and fees in pursuing MIDGULF in London arbitration, which are estimated to total $50,000 and accrued interest on the underlying claim in the amount of $18,622.46 at a rate of 7.5% per annum until the entry of judgment or an arbitration award in one year.

17.     Therefore, Plaintiff seeks an attachment pursuant to Rule B in the amount of USD $246,921.96.

18.     Upon information and belief, and after investigation, Defendant MIDGULF cannot be "found" within this District for the purpose of Rule B of the Supplemental Rules of Certain Admiralty and Maritime Claims, but Plaintiff is informed that Defendant has, or will shortly have, assets within this District comprising, *inter alia*, cash, funds, escrow funds, credits, debts, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire and/or sub-charter hire, of, belonging to, due or for the benefit of Defendant in the amount of $246,921.96 (collectively hereinafter, "ASSETS"), including but not limited to ASSETS in its name or for its benefit at, moving through, or being transferred and/or wired to or from banking institutions or such other garnishees who may be served with a copy of the Process of Attachment issued herein.

WHEREFORE, Plaintiff MANSOURA prays:

a.  That process in due form of law according to the practice of this Court in admiralty and maritime jurisdiction issue against the Defendant, citing it to appear and answer under oath all and singular the matters alleged, failing which a default will be taken against it;

b.  That since Defendant cannot be found within this District pursuant to Supplemental Rule B, that all assets of Defendant up to and including the sum of $246,921.96 may be restrained and attached, including but not limited to any cash, funds, credits, wire transfers, electronic funds transfers, accounts, letters of credit, freights, sub-freights, charter hire, sub-charter hire, and/or other assets of, belonging to, due or for the benefit of Defendant including but not limited to such

assets as may be held, received or transferred in its own name or for its benefit at, through, or within the possession, custody or control of such banking institutions and/or any such other garnishees who may be served with a copy of the Process of Maritime Attachment and Garnishment issued herein;

c. That this Court retain jurisdiction over this matter for purposes of any subsequent enforcement action as may be necessary; and,

d. For such other, further and different relief as this Court may deem just and proper in the premises.

Dated: New York, New York
June 2, 2008

*(signature)*
Pamela L. Schultz (PS 8675)
FREEHILL HOGAN & MAHAR, LLP
80 Pine Street
New York, NY 10005
(212) 425-1900
Attorneys for Plaintiff

## ATTORNEY VERIFICATION

State of New York    )
                       ) ss.:
County of New York )

      PAMELA L. SCHULTZ, being duly sworn, deposes and says as follows:

1. I am an associate with the law firm of Freehill Hogan & Mahar, LLP, attorneys for Plaintiff in this action, I have read the foregoing Verified Complaint and know the contents thereof, and the same is true to the best of my knowledge, information and belief.

2. The sources of my information and the grounds for my belief are communications, information and documentation provided by our client and/or by English solicitors representing our client.

3. The reason this verification is made by an attorney and not by the Plaintiff is because the Plaintiff is a foreign entity, none of whose officers are presently within this Judicial District.

                                                                                                                 */s/ Pamela Schultz*
                                                                                                                  Pamela L. Schultz

Sworn to before me this
2nd day of June 2008

*/s/ Lisa Morales*
Notary Public

Lisa M. Morales
Notary Public, State of New York
No. 01MO6162004
Qualified in the Bronx
Commission Expires Feb. 26, 2011

NYDOCS1/305737.1                            6

FIRST ORIGINAL

| | |
|---|---|
| ANCHOR CHARTERING SRL<br>Ponte Somalia Ponente<br>16149 GENOA<br>ITALY | THE BALTIC AND INTERNATIONAL MARITIME COUNCIL<br>UNIFORM GENERAL CHARTER (AS REVISED 1922, 1976 and 1994)<br>(To be used for trades for which no specially approved form is in force)<br>CODE NAME: "GENCON" |
| | 2. Place and Date<br>Piraeus, 11th January 2008 |
| 3. Owners/Place of business (Cl. 1)<br>Messrs.<br>MANSOURA MARITIME C/O<br>TRISTAR MANAGEMENT LTD<br>2 Il Merarchias Str.<br>18535 PIRAEUS - GREECE | 4. Charterers/Place of business (Cl. 1)<br>Messrs.<br>MIDGULF INTERNATIONAL LTD<br>LIMASSOL<br>CYPRUS |
| 5. Vessel's name (Cl. 1)<br>M/V "ANDROMEDA " - See clause no. 25.- | 6. GT/NT (Cl. 1)<br>6432/3452 |
| 7. DWT all told on summer load line in metric tons (abt.) (Cl. 1)<br>8,910 metric tons DWAT | 8. Present position (Cl. 1) |
| 9. Expected ready to load (abt.) (Cl. 1)<br>Vessel not to tender before the 12TH January 2008 | |
| 10. Loading port or place (Cl. 1)<br>1/2 safe berth(s)/anchorage Mariupol. | 11. Discharging port or place (Cl. 1)<br>1/2 safe berth(s)/ anchorage always afloat Abu Qir, Egypt pluce Selaata Lebanon where 21 feet salt water |
| 12. Cargo (also state quantity and margin in Owners' option, if agreed; if full and complete cargo not agreed state "part cargo") (Cl. 1)<br>8,000 metric tons 5% more or less in Charterers' option of crashed Sulphur in bulk stowing 31 feet without guarantee. The vessel at Selaata has to discharge about 5,500 metric tons. See clause 21. | |
| 13. Freight rate (also state whether freight prepaid or payable on delivery) (Cl. 4)<br>USD 57,00 per metric ton on entire quantity. | 14. Freight payment (state currency and method of payment; also beneficiary and bank account) (Cl. 4)<br>See clause no. 22.- |
| 15. State if vessel's cargo handling gear shall not be used (Cl. 5) | 16. Laytime (if separate laytime for load. and disch. is agreed, fill in a) and b). If total laytime for load. and disch., fill in c) only) (Cl. 6) |
| 17. Shippers/Place of business (Cl. 6) | (a) Laytime for loading<br>See clause no. 21- |
| 18. Agents (loading) (Cl. 6)<br>See clause no. 24.- | (b) Laytime for discharging<br>See clause no. 21.- |
| 19. Agents (discharging)( Cl. 6)<br>See clause no. 24.- | (c) Total laytime for loading and discharging |
| 20. Demurrage rate and manner payable (loading and discharging) (Cl. 7)<br>USD 10,000 per day or pro rata/despatch half demurrage on working time saved at both ends. See clause no. 22 | 21. Cancelling date (Cl. 9)<br>15th January 2008 |
| | 22. General Average to be adjusted at (Cl. 12) |
| 23. Freight Tax (state if for the Owners' account (Cl. 13 (c))<br>See clause no. 42.- | 24. Brokerage commission and to whom payable (Cl. 15)<br>2,50 % address commission + 1,25 % to Messrs. Anchor Chartering Italy on freight, dead freight and demurrage if any. |
| 25. Law and Arbitration (state 19 (a), 19 (b) or 19 (c) of Cl. 19; if 19 (c) agreed also state Place of Arbitration) (if not filled in 19 (a) shall apply) (Cl. 19)<br>See clause no. 35.- | 26. Additional clauses covering special provisions, if agreed<br>From clause no. 20.- to clause no. 44.- both inclusive as attached hereto, to apply. |
| (a) State maximum amount for small claims/shortened arbitration (Cl. 19) | |

Copyright, published by The Baltic and International Maritime Council (BIMCO), Copenhagen

It is mutually agreed that this Contract shall be performed subject to the conditions contained in this Charter Party which shall include Part I as well as Part II. In the event of a conflict of conditions, the provisions of Part I shall prevail over those of Part II to the extent of such conflict.

| Signature (Owners) | Signature (Charterers) |
|---|---|
| | |

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

EXHIBIT A

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

1. It is agreed between the party mentioned in Box 3 as the Owners of the Vessel named in Box 5, of the GT/NT indicated in Box 6 and carrying about the number of metric tons of deadweight capacity all told on summer loadline stated in Box 7, now in position as stated in Box 8 and expected ready to load under this Charter Party about the date indicated in Box 9, and the party mentioned as the Charterers in Box 4 that:
The said Vessel shall, as soon as her prior commitments have been completed, proceed to the loading port(s) or place(s) stated in Box 10 or so near thereto as she may safely get and lie always afloat, and there load a full and complete cargo (if shipment of deck cargo agreed same to be at the Charterers' risk and responsibility) as stated in Box 12, which the Charterers bind themselves to ship, and being so loaded the Vessel shall proceed to the discharging port(s) or place(s) stated in Box 11 as ordered on signing Bills of Lading, or so near Thereto as she may safely get and lie always afloat, and there deliver the cargo.

2. Owners' Responsibility Clause
The Owners are to be responsible for loss of or damage to the goods or for delay in delivery of the goods only in case the loss, damage or delay has been caused by personal want of due diligence on the part of the Owners or their Manager to make the Vessel in all respects seaworthy and to secure that she is properly manned, equipped and supplied, or by the personal act or default of the Owners or their Manager.
And the Owners are not responsible for loss, damage or delay arising from any other cause whatsoever, even from the neglect or default of the Master or crew or some other person employed by the Owners on board or ashore for whose acts they would, but for this Clause, be responsible, or from unseaworthiness of the Vessel on loading or commencement of the voyage or at any time whatsoever.

3. Deviation Clause
The Vessel has liberty to call at any port or ports in any order, for any purpose, to sail without pilots, to tow and/or assist Vessels in all situations, and also to deviate for the purpose of saving life and/or property.

4. Payment of Freight
(a) The freight at the rate stated in Box 13 shall be paid in cash calculated on the intaken quantity of cargo.
(b) Prepaid. If according to Box 13 freight is to be paid on shipment, it shall be deemed earned and non-returnable, Vessel and/or cargo lost or not lost.
Neither the Owners nor their agents shall be required to sign or endorse bills of lading showing freight prepaid unless the freight due to the Owners has actually been paid.
(c) On delivery. If according to Box 13 freight, or part thereof, is payable at destination it shall not be deemed earned until the cargo is thus delivered. Notwithstanding the provisions under (a), if freight or part thereof is payable on delivery of the cargo the Charterers shall have the option of paying the freight on delivered weight/quantity provided such option is declared before breaking bulk and the weight/quantity can be ascertained by official weighing machine, joint draft survey or tally.
Cash for Vessel's ordinary disbursements at the port of loading to be advanced by the Charterers, if required, at highest current rate of exchange, subject to two (2) per cent to cover insurance and other expenses.

5. Loading/Discharging
(a) Costs/Risks
The cargo shall be brought into the holds, loaded, stowed and/or trimmed, tallied, lashed and/or secured and taken from the holds and discharged by the Charterers, free of any risk, liability and expense whatsoever to the Owners. The Charterers shall provide and lay all dunnage material as required for the proper stowage and protection of the cargo on board, the Owners allowing the use of all dunnage available on board. The Charterers shall be responsible for and pay the cost of removing their dunnage after discharge of the cargo under this Charter Party and time to count until dunnage has been removed.
(b) Cargo Handling Gear
Unless the Vessel is gearless or unless it has been agreed between the parties that the Vessel's gear shall not be used and stated as such in Box 15, the Owners shall throughout the duration of loading/discharging give free use of the Vessel's cargo handling gear and of sufficient motive power to operate all such cargo handling gear. All such equipment to be in good working order. Unless caused by negligence of the stevedores, time lost by breakdown of the Vessel's cargo handling gear or motive power - pro rata the total number of cranes/winches required at that time for the loading/discharging of cargo under this Charter Party - shall not count as laytime or time on demurrage.
On request the Owners shall provide free of charge cranemen/winchmen from the crew to operate the Vessel's cargo handling gear, unless local regulations prohibit this, in which latter event shore labourers shall be for the account of the Charterers. Cranemen/winchmen shall be under the Charterers' risk and responsibility and as stevedores to be deemed as their servants but shall always work under the supervision of the Master.
(c) Stevedore Damage

The Charterers shall be responsible for damage (beyond ordinary wear and tear) to any part of the Vessel caused by Stevedores. Such damage shall be notified as soon as reasonably possible by the Master to the Charterers or their agents and to their Stevedores, failing which the Charterers shall not be held responsible. The Master shall endeavour to obtain the Stevedores' written acknowledgement of liability.
The Charterers are obliged to repair any stevedore damage prior to completion of the voyage, but must repair stevedore damage affecting the Vessel's seaworthiness or class before the Vessel sails from the port where such damage was caused or found. All additional expenses incurred shall be for the account of the Charterers and any time lost shall be for the account of and shall be paid to the Owners by the Charterers at the demurrage rate.

6. Laytime
*(a) Separate laytime for loading and discharging
The cargo shall be loaded within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
The cargo shall be discharged within the number of running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
*(b) Total laytime for loading and discharging
The cargo shall be loaded and discharged within the number of total running days/hours as indicated in Box 16, weather permitting, Sundays and holidays excepted, unless used, in which event time used shall count.
(c) Commencement of laytime (loading and discharging)
Laytime for loading and discharging shall commence at 13.00 hours, if notice of readiness is given up to and including 12.00 hours, and at 06.00 hours next working day if notice given during office hours after 12.00 hours. Notice of readiness at loading port to be given to the Shippers named in Box 17 or if not named, to the Charterers or their agents named in Box 18. Notice of readiness at the discharging port to be given to the Receivers or, if not known, to the Charterers or their agents named in Box 19.
If the loading/discharging berth is not available on the Vessel's arrival at or off the port of loading/discharging, the Vessel shall be entitled to give notice of readiness within ordinary office hours on arrival there, whether in free pratique or not, whether customs cleared or not. Laytime or time on demurrage shall then count as if she were in berth and in all respects ready for loading/discharging provided that the Master warrants that she is in fact ready in all respects. Time used in moving from the place of waiting to the loading/discharging berth shall not count as laytime.
If, after inspection, the Vessel is found not to be ready in all respects to load/discharge time lost after the discovery thereof until the Vessel is again ready to load/discharge shall not count as laytime.
Time used before commencement of laytime shall count.
* Indicate alternative (a) or (b) as agreed, in Box 16.

7. Demurrage
Demurrage at the loading and discharging port is payable by the Charterers at the rate stated in Box 20 in the manner stated in Box 20 per day or pro rata for any part of a day. Demurrage shall fall due day by day and shall be payable upon receipt of the Owners' invoice.
In the event the demurrage is not paid in accordance with the above, the Owners shall give the Charterers 96 running hours written notice to rectify the failure. If the demurrage is not paid at the expiration of this time limit and if the vessel is in or at the loading port, the Owners are entitled at any time to terminate the Charter Party and claim damages for any losses caused thereby.

8. Lien Clause
The Owners shall have a lien on the cargo and on all sub-freights payable in respect of the cargo, for freight, deadfreight, demurrage, claims for damages and for all other amounts due under this Charter Party including costs of recovering same.

9. Cancelling Clause
(a) Should the Vessel not be ready to load (whether in berth or not) on the cancelling date indicated in Box 21, the Charterers shall have the option of cancelling this Charter Party.
(b) Should the Owners anticipate that, despite the exercise of due diligence, the Vessel will not be ready to load by the cancelling date, they shall notify the Charterers thereof without delay stating the expected date of the Vessel's readiness to load and asking whether the Charterers will exercise their option of cancelling the Charter Party, or agree to a new cancelling date.
Such option must be declared by the Charterers within 48 running hours after the receipt of the Owners' notice. If the Charterers do not exercise their option of cancelling, then this Charter Party shall be deemed to be amended such that the seventh day after the new readiness date stated in the Owners' notification to the Charterers shall be the new cancelling date.
The provisions of sub-clause (b) of this Clause shall operate only once, and in

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

PART II
"Gencon" Charter (As Revised 1922, 1976 and 1994)

case of the Vessel's further delay, the Charterers shall have the option of cancelling the Charter Party as per sub-clause (a) of this Clause.

10. **Bills of Lading**
Bills of Lading shall be presented and signed by the Master as per the "Congenbill" Bill of Lading form, Edition 1994, without prejudice to this Charter Party, or by the Owners' agents provided written authority has been given by Owners to the agents, a copy of which is to be furnished to the Charterers. The Charterers shall indemnify the Owners against all consequences or liabilities that may arise from the signing of bills of lading as presented to the extent that the terms or contents of such bills of lading impose or result in the imposition of more onerous liabilities upon the Owners than those assumed by the Owners under this Charter Party.

11. **Both-to-Blame Collision Clause**
If the Vessel comes into collision with another vessel as a result of the negligence of the other vessel and any act, neglect or default of the Master, Mariner, Pilot or the servants of the Owners in the navigation or in the management of the Vessel, the owners of the cargo carried hereunder will indemnify the Owners against all loss or liability to the other or non-carrying vessel or her owners in so far as such loss or liability represents loss of, or damage to, or any claim whatsoever of the owners of said cargo, paid or payable by the other or non-carrying vessel or her owners to the owners of said cargo and set-off, recouped or recovered by the other or non-carrying vessel or her owners as part of their claim against the carrying Vessel or the Owners. The foregoing provisions shall also apply where the owners, operators or those in charge of any vessel or vessels or objects other than, or in addition to, the colliding vessels or objects are at fault in respect of a collision or contact.

12. **General Average and New Jason Clause**
General Average shall be adjusted in London unless otherwise agreed in Box 22 according to York-Antwerp Rules 1994 and any subsequent modification thereof. Proprietors of cargo to pay the cargo's share in the general expenses even if same have been necessitated through neglect or default of the Owners' servants (see Clause 2).

If General Average is to be adjusted in accordance with the law and practice of the United States of America, the following Clause shall apply: "In the event of accident, danger, damage or disaster before or after the commencement of the voyage, resulting from any cause whatsoever, whether due to negligence or not, for which, or for the consequence of which, the Owners are not responsible, by statute, contract or otherwise, the cargo shippers, consignees or the owners of the cargo shall contribute with the Owners in General Average to the payment of any sacrifices, losses or expenses of a General Average nature that may be made or incurred and shall pay salvage and special charges incurred in respect of the cargo. If a salving vessel is owned or operated by the Owners, salvage shall be paid for as fully as if the said salving vessel or vessels belonged to strangers. Such deposit as the Owners, or their agents, may deem sufficient to cover the estimated contribution of the goods and any salvage and special charges thereon shall, if required, be made by the cargo, shippers, consignees or owners of the goods to the Owners before delivery.".

13. **Taxes and Dues Clause**
(a) *On Vessel* -The Owners shall pay all dues, charges and taxes customarily levied on the Vessel, howsoever the amount thereof may be assessed
(b) *On cargo* -The Charterers shall pay all dues, charges, duties and taxes customarily levied on the cargo, howsoever the amount thereof may be assessed
(c) *On freight* -Unless otherwise agreed in Box 23, taxes levied on the freight shall be for the Charterers' account.

14. **Agency**
In every case the Owners shall appoint their own Agent both at the port of loading and the port of discharge.

15. **Brokerage**
A brokerage commission at the rate stated in Box 24 on the freight, dead-freight and demurrage earned is due to the party mentioned in Box 24.
In case of non-execution 1/3 of the brokerage on the estimated amount of freight to be paid by the party responsible for such non-execution to the Brokers as indemnity for the latters' expenses and work. In case of more voyages the amount of indemnity to be agreed.

16. **General Strike Clause**
(a) If there is a strike or lock-out affecting or preventing the actual loading of the cargo, or any part of it, when the Vessel is ready to proceed from her last port or at any time during the voyage to the port or ports of loading or after her arrival there, the Master or the Owners may ask the Charterers to declare, that they agree to reckon the laydays as if there were no strike or lock-out. Unless the Charterers have given such declaration in writing (by telegram, if necessary) within 24 hours, the Owners shall have the option of cancelling this Charter Party. If part cargo has already been loaded, the Owners must proceed with same, (freight payable on loaded quantity only) having liberty to complete with other cargo on the way for their own account.

(b) If there is a strike or lock-out affecting or preventing the actual discharging of the cargo on or after the Vessel's arrival at or off port of discharge and same has not been settled within 48 hours, the Charterers shall have the option of keeping the Vessel waiting until such strike or lock-out is at an end against paying half demurrage after expiration of the time provided for discharging until the strike or lock-out terminates and thereafter full demurrage shall be payable until the completion of discharging, or of ordering the Vessel to a safe port where she can safely discharge without risk of being detained by strike or lock-out. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the strike or lock-out affecting the discharge. On delivery of the cargo at such port, all conditions of this Charter Party and of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance to the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion.

(c) Except for the obligations described above, neither the Charterers nor the Owners shall be responsible for the consequences of any strikes or lock-outs preventing or affecting the actual loading or discharging of the cargo.

17. **War Risks ("Voywar 1993")**
(1) For the purpose of this Clause, the words:
(a) The "Owners" shall include the shipowners, bareboat charterers, disponent owners, managers or other operators who are charged with the management of the Vessel, and the Master; and
(b) "War Risks" shall include any war (whether actual or threatened), act of war, civil war, hostilities, revolution, rebellion, civil commotion, warlike operations, the laying of mines (whether actual or reported), acts of piracy, acts of terrorists, acts of hostility or malicious damage, blockades (whether imposed against all Vessels or imposed selectively against Vessels of certain flags or ownership, or against certain cargoes or crews or otherwise howsoever), by any person, body, terrorist or political group, or the Government of any state whatsoever, which, in the reasonable judgement of the Master and/or the Owners, may be dangerous or are likely to be or to become dangerous to the Vessel, her cargo, crew or other persons on board the Vessel.

(2) If at any time before the Vessel commences loading, it appears that, in the reasonable judgement of the Master and/or the Owners, performance of the Contract of Carriage, or any part of it, may expose, or is likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks, the Owners may give notice to the Charterers cancelling this Contract of Carriage, or may refuse to perform such part of it as may expose, or may be likely to expose, the Vessel, her cargo, crew or other persons on board the Vessel to War Risks; provided always that if this Contract of Carriage provides that loading or discharging is to take place within a range of ports, and at the port or ports nominated by the Charterers the Vessel, her cargo, crew, or other persons onboard the Vessel may be exposed, or may be likely to be exposed, to War Risks, the Owners shall first require the Charterers to nominate any other safe port which lies within the range for loading or discharging, and may only cancel this Contract of Carriage if the Charterers shall not have nominated such safe port or ports within 48 hours of receipt of notice of such requirement

(3) The Owners shall not be required to continue to load cargo for any voyage, or to sign Bills of Lading for any port or place, or to proceed or continue on any voyage, or on any part thereof, or to proceed through any canal or waterway, or to proceed to or remain at any port or place whatsoever, where it appears, either after the loading of the cargo commences, or at any stage of the voyage thereafter before the discharge of the cargo is completed, that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo (or any part thereof), crew or other persons on board the Vessel (or any one or more of them) may be, or are likely to be, exposed to War Risks. If it should so appear, the Owners may by notice request the Charterers to nominate a safe port for the discharge of the cargo or any part thereof, and if within 48 hours of the receipt of such notice, the Charterers shall not have nominated such a port, the Owners may discharge the cargo at any safe port of their choice (including the port of loading) in complete fulfilment of the Contract of Carriage. The Owners shall be entitled to recover from the Charterers the extra expenses of such discharge and, if the discharge takes place at any port other than the loading port, to receive the full freight as though the cargo had been carried to the discharging port and if the extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route, the Owners having a lien

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

## PART II
### "Gencon" Charter (As Revised 1922, 1976 and 1994)

on the cargo for such expenses and freight. 301
(4) If at any stage of the voyage after the loading of the cargo commences, it appears that, in the reasonable judgement of the Master and/or the Owners, the Vessel, her cargo, crew or other persons on board the Vessel may be, or are likely to be, exposed to War Risks on any part of the route (including any canal or waterway) which is normally and customarily used in a voyage of the nature contracted for, and there is another longer route to the discharging port, the Owners shall give notice to the Charterers that this route will be taken. In this event the Owners shall be entitled, if the total extra distance exceeds 100 miles, to additional freight which shall be the same percentage of the freight contracted for as the percentage which the extra distance represents to the distance of the normal and customary route. 302–313

(5) The Vessel shall have liberty:- 314
(a) to comply with all orders, directions, recommendations or advice as to departure, arrival, routes, sailing in convoy, ports of call, stoppages, destinations, discharge of cargo, delivery or in any way whatsoever which are given by the Government of the Nation under whose flag the Vessel sails, or other Government to whose laws the Owners are subject, or any other Government which so requires, or any body or group acting with the power to compel compliance with their orders or directions; 315–321
(b) to comply with the orders, directions or recommendations of any war risks underwriters who have the authority to give the same under the terms of the war risks insurance; 322–324
(c) to comply with the terms of any resolution of the Security Council of the United Nations, any directives of the European Community, the effective orders of any other Supranational body which has the right to issue and give the same, and with national laws aimed at enforcing the same to which the Owners are subject, and to obey the orders and directions of those who are charged with their enforcement; 325–330
(d) to discharge at any other port any cargo or part thereof which may render the Vessel liable to confiscation as a contraband carrier; 331–332
(e) to call at any other port to change the crew or any part thereof or other persons on board the Vessel when there is reason to believe that they may be subject to internment, imprisonment or other sanctions; 333–335
(f) where cargo has not been loaded or has been discharged by the Owners under any provisions of this Clause, to load other cargo for the Owners' own benefit and carry it to any other port or ports whatsoever, whether backwards or forwards or in a contrary direction to the ordinary or customary route. 336–340

(6) If in compliance with any of the provisions of sub-clauses (2) to (5) of this Clause anything is done or not done, such shall not be deemed to be a deviation, but shall be considered as due fulfilment of the Contract of Carriage. 341–344

**18. General Ice Clause** 345
*Port of loading* 346
(a) In the event of the loading port being inaccessible by reason of ice when the Vessel is ready to proceed from her last port or at any time during the voyage or on the Vessel's arrival or in case frost sets in after the Vessel's arrival, the Master for fear of being frozen in is at liberty to leave without cargo, and this Charter Party shall be null and void. 347–351
(b) If during loading the Master, for fear of the Vessel being frozen in, deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to any other port or ports with option of completing cargo for the Owners' benefit for any port or ports including port of discharge. Any part cargo thus loaded under this Charter Party to be forwarded to destination at the Vessel's expense but against payment of freight, provided that no extra expenses be thereby caused to the Charterers, freight being paid on quantity delivered (in proportion if lumpsum), all other conditions as per this Charter 352–359

Party. 360
(c) In case of more than one loading port, and if one or more of the ports are closed by ice, the Master or the Owners to be at liberty either to load the part cargo at the open port and fill up elsewhere for their own account as under section (b) or to declare the Charter Party null and void unless the Charterers agree to load full cargo at the open port. 361–365

*Port of discharge* 366
(a) Should ice prevent the Vessel from reaching port of discharge the Charterers shall have the option of keeping the Vessel waiting until the re-opening of navigation and paying demurrage or of ordering the Vessel to a safe and immediately accessible port where she can safely discharge without risk of detention by ice. Such orders to be given within 48 hours after the Master or the Owners have given notice to the Charterers of the impossibility of reaching port of destination. 367–373
(b) If during discharging the Master for fear of the Vessel being frozen in deems it advisable to leave, he has liberty to do so with what cargo he has on board and to proceed to the nearest accessible port where she can safely discharge. 374–376
(c) On delivery of the cargo at such port, all conditions of the Bill of Lading shall apply and the Vessel shall receive the same freight as if she had discharged at the original port of destination, except that if the distance of the substituted port exceeds 100 nautical miles, the freight on the cargo delivered at the substituted port to be increased in proportion. 377–381

**19. Law and Arbitration** 382
* (a) This Charter Party shall be governed by and construed in accordance with English law and any dispute arising out of this Charter Party shall be referred to arbitration in London in accordance with the Arbitration Acts 1950 and 1979 or any statutory modification or re-enactment thereof for the time being in force. Unless the parties agree upon a sole arbitrator, one arbitrator shall be appointed by each party and the arbitrators so appointed shall appoint a third arbitrator, the decision of the three-man tribunal thus constituted or any two of them, shall be final. On the receipt by one party of the nomination in writing of the other party's arbitrator, that party shall appoint their arbitrator within fourteen days, failing which the decision of the single arbitrator appointed shall be final.
For disputes where the total amount claimed by either party does not exceed the amount stated in Box 25** the arbitration shall be conducted in accordance with the Small Claims Procedure of the London Maritime Arbitrators Association. 383–397

* (b) This Charter Party shall be governed by ~~and construed in accordance with Title 9 of the United States Code~~ and the Maritime Law of the United States and ~~should any dispute arise out of this Charter Party, the matter in dispute shall be referred to three persons at New York, one to be appointed by each of the parties hereto, and the third by the two so chosen; their decision or that of any two of them shall be final, and for purpose of enforcing any award, this agreement may be made a rule of the Court. The proceedings shall be conducted in accordance with the rules of the Society of~~ Maritime Arbitrators, Inc., 398–406
For disputes where the ~~total amount claimed by either party does not exceed the amount stated in Box 25**~~ the arbitration shall be conducted in accordance with the Shortened Arbitration Procedure of the Society of Maritime Arbitrators, Inc. 407–410

* (c) Any dispute ~~arising out of this Charter Party~~ shall be referred to arbitration at the place indicated in Box 25, ~~subject to the procedures applicable there. The~~ laws of the place ~~indicated in Box 25~~ shall govern ~~this Charter Party~~. 411–413
(d) If Box 25 in Part I is not filled in, sub-clause (a) of this Clause shall apply. 414
* (a), (b) and (c) are alternatives; indicate alternative agreed in Box 25. 415
** Where no figure is supplied in Box 25 in Part I, this provision only shall be void but the other provisions of this Clause shall have full force and remain in effect. 416–417

This document is a computer generated GENCON 1994 form printed by authority of BIMCO. Any insertion or deletion to the form must be clearly visible. In the event of any modification made to the pre-printed text of this document which is not clearly visible, the text of the original BIMCO approved document shall apply. BIMCO assumes no responsibility for any loss, damage or expense as a result of discrepancies between the original BIMCO approved document and this computer generated document.

# MV ANDROMEDA – MIDGULF C/P DATED 11TH JANUARY 2008
## ADDITIONAL CLAUSES

**Clause 20**
**Vessel's Description:**
MV. "ANDROMEDA"
Built 2001 Malta flag
8,910 dwat on 8.10 m
singledecker
3 holds/hatches
loa/beam 130.86/17.70 m
grain/bale 406/365931 cubic feet
electrical ventilated,
grt/nrt 6432/3452
grain capacity per hold:
nr 1  59.823 cubic feet
nr 2 175.761 cubic feet
nr 3 170.994 cubic feet
bale capacity per hold:
nr 1  53.820 cubic feet
nr 2 158.210 cubic feet
nr 3 153.901 cubic feet
tank top strengthened : about 9.5 mt/sqm
vessel considered as gearless
maximum air draft in ballast 33.55 m.
maximum distance in ballast from waterline to hatch-coaming 8.50 m.
hatch dimensions:
nr 1 12,60 x 8.00
nr 2 25.20 x 13.00
nr 3 25.20 x 13.00
holds dimensions:
width length height
holds  fwd - aft w. deck h/c
no.1  8.26 - 16.00 16.85  9.40 11.40
no.2 16.00 - 17.67 30.20 10.80 13.00
no.3 17.67 - 17.67 29.50 10,60 12.80
Class: Lloyd's Register
vessel ice class 1c
P+i : The American Club
Owners confirm that vessel to be:
A. Singledecker Bulk Carrier, with "B" certificates/ suitable to load sulphur.
B. Ice class ( imperative)
C. Maximum lbp 148 m.
D. As per vessel's description
E. As per vessel's description
F. Deleted.
G. Deleted.
H. Vessel should not be Arab blacklisted.
I.  Owners warrant that vessel is both ism compliant and fully year 2000 compliant in accordance with Bimco ISM and year 2000 clauses.
J. The Charter Party to show the following clause
" from the date of coming into force of the international safety Management ( ism) code in relation to the vessel, and thereafter during the Currency of this Charter Party, the owner will ensure that the company ( as defined in the ISM CODE) holds a valid document of compliance ( doc) and that the vessel holds a valid safety management certificate ( SMC)."

Cont. Clause 20

K. Owners warrant vessel is fully P&I covered and classed for the duration of the voyage. Also Owners guarantee that vessel is insured for her full tonnage with a reputable and recognised P&I club in respect of all risks including in particular liability for claims made against Owners in respect of damage to and/or loss of cargo and undertake to maintain such hull and machinery and P&I insurance in force throughout the currency of this Charter Party. In the event of the vessel's entry being transferred to another P&I club, Owners undertake to give Charterers immediate notice of such transfer.

L. Owners warrant that during the currency of this Charter Party period, vessel's ownership, registration and flag not to be changed and/or transferred.

M. Owners guarantee that nominated vessel and / or any other vessel belongs to Owners is free of liens and / or arrest. Also that nominated vessel will not be sold or scrapped or redelivered during the currency of this contract.

N. Vessel is in possession of accurate and valid hydrostatic calibration tables.

O. Vessel and ownership shall comply with all rules and regulations of Ukrainian seaports as well as any other applicable regulations, port limitations, practices and procedures of the loading port.

P. Vessel and ownership is covered by adequate oil pollution contingency plans and vessel is fully insured for any oil spillage at ports and countries of this voyage.

Q. Vessel and ownership shall comply at their risk and expense with the rules and regulations relevant to water and / or air pollution at ports under this Charter Party. In no case shall Charterers be liable for demurrage as a result of Owners' failure to comply with such rules and regulations.

R. Owners to advise last 3 cargoes: Ammonium Sulphate , Urea , Clinker

S. Vessel full itinerary : vessel ballasting in black sea empty of cargo

T. Owners to furnish the following upon final fixture of main terms:
 i    Valid copies of class, registration, P&I club and H&M certificates for the duration of the intended voyage
 ii.   B certificate.
 iii.  Advise vessel's P&I club correspondents at loading and discharging ports.
 iv.   Owners to confirm on their letter head papers that they are neither bankrupt, insolvent nor are they in default of any payments due from them as of the Charter Party dated.

2)- account : Midgulf International Ltd

Charterers' background:

Midgulf International Ltd was established in 1976, as an international trading house specializing in the trade of fertilizers, fertilizers raw materials and grains. Their trade covers north & East Africa, the Indian subcontinent, Europe, north & South America. Midgulf 's head office is in Cyprus and has regional offices in the United Kingdom & Jordan and has satellite offices in France, Italy and Sudan and agents in Sri Lanka, Egypt, & Ethiopia. Midgulf is a member of DUTCH P&I, a member of Ifa (the International Fertilisers Association) and a member of Gafta (Grains And Feed Trade Association).

Please check following Charterers website :   www.midgulfgroup.com

Charterers last 3 vessel fixed:
- m/v Lady Mariam – dwt 17000 / loaded Fertilizers Ex Red Sea to East Africa
- m/v Kenatsi    dwt 18200 / loaded Urea from Libya to Port Sudan
- m/v Oriantal Star – dwt 14000 / loaded Fertilizers from Red Sea to East Africa

Clause 21

Cargo/Super cargo/loading-discharging rates

Owners are not responsible for the type /quality/condition or damages of the cargo unless caused by the vessel during the voyage. All holds loaded with cargo to be sealed after loading by Master/Agents/Shippers/or Owners P&I and to be unsealed at discharge port by Master/Agents/Receivers or Owners P&I representative. Upon discharging completion of cargo from vessel's hold Owners/vessel will not be liable for any shortage.

Cargo shall be loaded by Charterers/ Shippers free of risk and expenses to the vessel. Any extra levelling, trimming or filling if required  by the vessel's Master, to be at Owner's risk and expenses and time used for same not to count as used laytime or time on demurrage. Such work shall be accomplished by vessel.

Trimming of cargo to be done by grab and small well-loader.

Owners grant to Charterers the permission to appoint a supercargo, who shall board the vessel and attend full cargo loading / discharging operations which to be prosecuted with the utmost despatch. He is to be fully supported by Master and crew and furnished with free accommodation and same fare as provided for Master's table.

Super cargo not allowed to accompany vessel during sea passage.

Charterers to pay for the expenses of super cargo as required by the Master.

Cont. Clause. 21
Cargo loading rate to be 4000 metric tons per weather working day Saturday noon/Monday 08:00 hours excluded even if used.
Loading shall not take place and time shall cease to count during the following weather conditions:
- wind of 9 meters per second and more
- precipitation, frost, snow, fog
- sea - beaufort scale 3 and more
- laytime shall be deemed completed and shall cease upon completion of the loading operation.

The Master shall be responsible for stopping and starting loading operations during any period of precipitation. Time lost due to precipitation shall not count as used laytime. The vessel shall vacate the berth as soon as practicable after completion of loading.
Cargo discharging to be:
At Abu Qir 2000 metric tons per weather working day Thursday noon/Saturday 08:00 hours excluded even if used.
At Selaata 3000 metric tons per weather working day Saturday noon/ Monday 08:00 hours excluded even if used.
Upon arrival at loading places, the vessel shall have the hatches open and ready to load in all respects as far as weather permits per ( a & b) above.
If cargo holds are not found in satisfactory condition to load the cargo then time from holds rejection till acceptance of same will not count as laytime".
Loading and discharging rates based upon vessel's workable 3 holds/ 3 hatches/ 3 hooks as described. If less then rates to be prorated. An hatch is to be considered unworkable in the event that hatch cannot be opened.
Vessel to have water tight holds and hatch covers complete and in good working order in all hatches. All openings and closing of hatches at loading and discharging ports shall be for vessel's account, provided local regulation permit.

Clause 22
**Freight Payment**
97.5% freight. Payable within (3) banking days from signature/release Bills of Lading marked 'Freight Prepaid' and Clean on Board' in conformity with mates receipt, less address commission / brokerage, and/or extra insurance and estimated despatch at loading ports if any.
Undisputed demurrage at loading port , if any , to be paid together with freight payment .
Balance freight less despatch or plus demurrage at discharging port to be settled within 20 days from Owners submittance of laytime statement supported by Statement of Fact
Owners Bank details: Reverting

Clause 23
**Notice at loading/discharging ports**
Prior to tendering Notice of Readiness vessel to be clean / dry / lime washed if required by Agents, free from smell, loose rust and residue of previous cargo to Charterers / Shippers Surveyor's satisfaction.
At loading/discharging port laytime to commence at 1400 hours if Notice of Readiness is tendered before noon and at 08:00 hours of the next working day, if Notice of Readiness tendered after noon.
At both ends Notice of Readiness to be tendered during office hours (08:00 – 16:00 ).
Time at Selaata to start counting on vessel's arrival.
After vessel has served a written or cabled Notice that she is ready in all respects to receive/discharge the cargo. The said Notice at the loading port may not be tendered prior to the layday. Any time used in loading/discharging prior to commencement of laytime shall count as used laytime.
Master of the vessel to provide to Agents and other notifying parties (2) notices of ETA as required by the rules and regulations for Ukranian seaports, namely 2days, 24/12/6 hours. To provide a valid Notice of Readiness to be tendered by the Master of the vessel, indicating the quantity of the cargo and the cargo plan, the distance between the waterline and the hatch coamings, the demurrage rate.
If vessel subs fails free pratique for reasons related to vessel crew, invalid certificates, etc or to cleanliness certificate then time to cease from failure until fully passed.
Owners to give 2/1 day Notice of Readiness and arrival time at loading and discharging ports.
Owners, Master to make sure to send notice of arrival every 12 hours.

Clause 24.
**Agents at Loading Port**
ALEKSANDR RAZUVANOV
For and behalf of Tranship/agency department
Phone +38(482) 34-74-06 333332/Fax +38 0482 347407
E-mail operating@transship.com.ua

Cont. Clause 24
Agents at Discharging port
Reverting

Clause 25.
Charterers, Shippers
Charterers:
Midgulf International Ltd
c/o Jordan Regional office
Phone +96265601783
Fax+96265698219
E-mail chartering@midgulfgroup.com

Shippers
Reverting

Clause 26.
Taxes
Any / all taxes / dues / wharfages on cargo to be for Charterers' account both ends.
Any / all taxes / dues / wharfages on vessel/ freight./ flag/ certificates/ crew to be for Owners account both ends even if same calculated on the quantity of cargo loaded.

Clause 27.
Dunnage
Any dunnage, separation materials, plastic sheets or draft paper needed by Shippers' surveyor due to vessel's holds conditions of the nature of cargo to be for Owners time and account both ends.

Clause 28.
Average
In case of average, same shall be adjusted, stated and settled according to York - Antwerp rules 1994, or any subsequent modification thereof, in London, and in case the ship should put into port or ports with damages, the Master or the Owners shall, without delay, where practicable, inform Charterers thereof by telegraph, and in case of jettison, Master shall report in writing full particulars of same to the Consignee immediately on arrival.

Clause 29.
L.O.I.
In the event original Bills of Lading are not available at the port of discharge then Owners agree to discharge the cargo to Charterers order against a L.O.I. drawn up in accordance with Owners' P&I Club wording and signed by Charterers and the following rider clause to be inserted in the Charter Party.
"Charterers will make every endeavour to ensure that original Bill(s) of Lading are available at discharge port on or before vessel's arrival to discharge. However, if original Bills of Lading are not available then Owners / Master will permit to discharge the cargo to Charterers order without delay against Charterers L.O.I based on Owners P&I Club standard wording signed by Charterers only. Original Bills of Lading to be forwarded to Owners as soon as they become available".

Clause 30.
Arbitration
(Lmaa) any and all disputes of whatsoever nature arising out of or relating to this charter, or to the making, performance or termination hereof, or to any Bill of Lading issued hereunder, if cannot be amicably resolved, shall be referred to the arbitration in London and English Law to apply. Unless both parties agree on one arbitrator, then three man tribunal thus constituted one to be appointed by the Owners, one to be appointed by the Charterers, and the third by the two so chosen, who shall be the chairman. A party must appoint its Arbitrator within 20 calendar days of appointment of the first appointed arbitrator, failing which the third arbitrator shall become the sole Arbitrator. The third Arbitrator must be appointed within 20 calendar days of appointment of the second Arbitrator, failing which the third Arbitrator shall be appointed by the president of the London Marine Arbitrators Association on the request of either party appointed Arbitrator any dispute is to be referred to arbitration within 9 months of the completion of discharge. Otherwise a claim arising from the dispute is deemed waived, and absolutely time barred.

**Clause 31.**
**Arbitration – small amount**
Notwithstanding what stated into clause 31, if the amount in dispute is less than usd $ 25,000 then:
(a) the dispute is to be referred to arbitration under the " L.M.A.A. small claims procedure"
(b) the Arbitrator's decision is to be final and binding on both parties;
(c) the parties waive the right to appeal the arbitrator's decision.

**Clause 32.**
**Use of Light**
Vessel to supply free use of lights (especially for night work) as on deck and in holds if required at any time day or night.
Owners warrants that the vessel is capable of loading at night and shall make available the vessel's on-board lighting sufficient for both day and night work both on deck and in holds free of expense to Shippers/Charterers.

**Clause 33**
**Overtime**
Overtime to be for the party ordering same, if overtime requires by port authority, then same to be for Charterers account but vessel's officers and crew overtime to bent ways for Owners' account .

**Clause 34**
**Nor during port congestion**
In case of congestion causing vessel to be delayed from berthing Master to have the right to tender Notice of Readiness by cable/fax/telex from anchorage/waiting area time used in moving from the place of waiting till vessel is berthed shall not count as laytime.

**Clause 35.**
**Covering of hatches**
The Master shall cover the hatch of each hold as soon as loading into same is finished and also all hatches when loading/discharging is finished for the day, or if the weather is wet or threatening. Vessel's Master shall also keep covered all hatches in which loading/ discharging is not actually being performed.

**Clause 36.**
**Shifting**
Time used for shifting from anchorage to loading berth shall not be counted as used laytime or time or demurrage. Time lost by the inability of the vessel to load in accordance with this agreement shall cease to count as used laytime or time on demurrage until the vessel has been fully secured alongside the loading facility and is ready in all respects to receive cargo.

**Clause 37.**
**Stevedores damages**
The Pilot, Master, Officers and crew of the vessel and any towboat person , or facility assisting the vessel shall not be Agents or employees of the Charterers and the Charterers shall not be liable for any loss , damage or claim resulting from or arising out of negligence or error of any of them while the vessel is proceeding to or from or lying at any place of loading and discharging ports /anchorage / waiting areas.
The Stevedores, although appointed by the Charterers, Shippers or Receivers or by their Agents, to be under the supervision , direction and control of the Master. However Charterers, Shippers or Receiver or Agents shall not be responsible for any negligence and default of error in judgement of Stevedores employed but in case of damages made to the vessel by stevedores owners to try to obtain remuneration from stevedores directly , failing which Charterers to do their utmost to assist Owners to reach an applicable solution with Stevedores.
Charterers privilege to place bulldozers / pay loaders in holds to facilitate trimming during loading and or discharge using vessel's shore crane to place / remove same in / from vessel. always to vessel's tank top strength at Charterers' /Shippers/Receivers cost. (only for bulk cargo). Bulldozers weight to be in accordance with tank top strength.

**Clause 38.**
**Force Majeure**
In case of extreme difficulties, or force Majeure situation, Owners must consult Charterers and both parties mutually agree a plan of action and in writing.

Cont. Clause 38
Any of the following causes are excepted, regardless of where they occur: strikes or lockouts at the Shippers' or suppliers' mines or factory, on railways, trucks or barges, or at the ports of loading or discharging; war or effects of war, revolution, civil commotion; breakdown on or stoppage or shortage of railways, trucks or barges, interruptions, stoppage or breakdown at the factory of the Shippers' or the suppliers' now or hereafter under contract; stoppage or destruction of goods in transit; epidemic, frost, fire, cyclones, storms, floods, earthquakes, unavoidable accidents to machinery or equipment, or other unavoidable hindrances or delays in mining, manufacturing, transporting, loading, discharging or receiving the material or goods; restraints of established authorities; any delay caused by the vessel, Master or crew and any other causes arising happening without the fault of the Charterers preventing or delaying the mining or manufacturing, supplying, transporting, loading, discharging or receiving of the cargo. Charterers shall not be liable for any loss or damage resulting from any such excepted causes and time lost by reason thereof shall not count as used lay time on demurrage. However, only for the purpose of settling despatch, such time lost is to be counted as lay time used.

Clause 39.
Ice Breaker
Assistance cost via Azov Sea + Kertch canal (both in/out) to be 50% for Charterers' account and 50% for Owners' account.
Charterers will pay 50% of the costs along with freight. The Owners are requested to send to the Charterers the invoice showing the total cost of the ice break.
Ice breaker cost from Kertch to Mariupol and Mariupol to Kertch to be shared equally between Charterers and Owners - according to Agents.
Ice breaker assistance in Azov Sea USD 3.716 x 2 plus ice breaker assistance in Kertch strait USD 972.20 x 2 i.e. cost per each party is USD 4688,20.
Any time lost for waiting convoy from Kertch to Mariupol as well as from Mariupol anchorage to the loading berth and from loading berth to Mariupol anchorage and up to passing Kertch outbound to be for Charterers' account. The time lost to be compensated to the Owners at the rate of USD 9.000 daily pro-rata together with freight payment. Time lost in entering to start counting as from 12th January 2008 14:00 hours.

Clause 40.
Extra Insurance
Free any extra insurance to the vessel.

Clause 41.
Holds' Cleaning
Owners to satisfy themselves with any restrictions both ends. At the nominated loading port(s), Owners to tender vessel with holds properly swept, cleaned and dried, and free of lose rust, totally free of grains, residues on all previous cargoes, lime washed to Shipper's inspection's satisfaction, and in all respects ready to receive the cargo of bulk sulphur. Prior of tendering the vessel for loading the cargo battens has to be removed, bilge boards and timber boards has to be in place and made tight against cargo seepage and rose boxes are to be suitably covered against cargo seepage.

Clause 42.
Stowage/Trimming
At all times the vessel's Master shall supervise the safe stowage and trim of the vessel and shall assign one of his Officers to control all vessel operations during loading.

Clause 43.
Fresh water into holds
If fresh water is poured on the ore (sulphur) during loading/ transportation; then fresh water should be pumped out without leaving no water traces which could hinder the discharging operations. Owners/Master to bear the entire responsibility of any claim / extra expenses caused by not abiding to this clause

Clause 44.
Draft Survey:
For the purpose of performing draft surveys, the vessel is to furnish a certified calibration scale for all tanks, including fore and aft peak tanks, double bottom tanks, and deeptanks, if any. The vessel shall clearly cut and mark on shell plating plimsol and other draft marks amidship, and draft marks at the bow and stern on port and starboard sides. Vessel is to furnish Charterers or their agent or surveyor a capacity plan, displacement scale, deadweight scale and any other hydrostatic information required by the draft surveyors. The Master must certify that all documents supplied are correct.

Cont. Clause 44

At preliminary survey, the total quantity of ballast bunkers, stores etc. Are to reasonably agree with the deadweight indicated on the deadweight scale. Vessel's trim when conducting draft surveys to be within the range covered by calibrating trim tables. Vessel Owners shall be liable for all loss, damage and expenses caused by the vessel or Master's failure to comply with this clause, time lost by reason of such failure shall not count as used laytime or time on demurrage.

Time spent for final draft survey not to count, time waiting for surveyor to count.